AUSA: Samuel P. Rothschild

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                           v.<br><br>JOSEPH OTERO,<br><br>                                    Defendant. | **23 MAG 6862**<br>**SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 922(g)(1) and 2<br><br>COUNTY OF OFFENSE:<br>BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRIAN SHEA, being duly sworn, deposes and says that he is a Detective with the New York City Police Department (the "NYPD"), and charges as follows:

### COUNT ONE
### (Possession of a Firearm After a Felony Conviction)

1.  On or about August 5, 2023, in the Southern District of New York and elsewhere, JOSEPH OTERO, the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a 9mm Smith & Wesson pistol, and the firearm was in and affecting commerce.

(Title 18, United States Code, Sections 922(g)(1) and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2.  I have been involved in the investigation of this matter, and I base this affidavit on that experience, as well as on my conversations with other law enforcement officers, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.  Based on my review of criminal history records for JOSEPH OTERO, the defendant, including records from *United States v. Joseph Otero, a/k/a "Triple H,"* 14 Cr. 212 (RJS) (S.D.N.Y.), including the operative Superseding Information, the transcript of the change-of-plea hearing, and the judgment of conviction, I have learned, among other things, the following:

   a.   On or about March 17, 2015, OTERO:

        i.   pled guilty to one count of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and confirmed on the record that he understood that that count carried a maximum term of imprisonment of life;

        ii.  pled guilty to one count of assault with a deadly weapon and attempted murder in aid of racketeering activity, in violation of Title 18, United States Code,

Sections 1959(a)(3), 1959(a)(5), and 2, and confirmed on the record that he understood that that count carried a maximum term of imprisonment of twenty years;

   iii. pled guilty to one count of narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A), and confirmed on the record that he understood that that count carried a maximum term of imprisonment of life and a mandatory minimum term of ten years' imprisonment;

   iv. pled guilty to two counts of Hobbs Act robbery, in violation of Title 18, United States Code, Sections 1951 and 2, and confirmed on the record that he understood that each of those counts carried a maximum term of imprisonment of twenty years;

   v. pled guilty to one count of using firearms, which were discharged, in furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2, and confirmed on the record that he understood that that count carried a maximum term of imprisonment of life and a mandatory minimum term of ten years' imprisonment;

   vi. pled guilty to one count of using firearms, which were discharged, in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii), 924(c)(1)(C)(i), and 2, and confirmed on the record that he understood that that count carried a maximum term of imprisonment of life and a mandatory minimum term of twenty-five years' imprisonment; and

   vii. pled guilty to one count of obstruction of justice, in violation of Title 18, United States Code, Sections 1512(c)(1) and 1512(c)(2), and confirmed on the record that he understood that that count carried a maximum term of imprisonment of twenty years.

  b. On or about April 18, 2017, OTERO was sentenced principally to time served, which amounted to approximately 37 months' imprisonment, plus two days' imprisonment following the sentencing hearing.

  4. Based on my participation in this investigation, including my conversations with other law enforcement officers, and my review of body worn camera video and law enforcement reports, I have learned, in substance and in part, and among other things, the following:

  a. On or about August 5, 2023, a team of at least six uniformed law enforcement officers (the "Officers") was patrolling in the Bronx, New York, in two unmarked vehicles ("Unmarked Vehicle-1" and "Unmarked Vehicle-2," and, together, the "Unmarked Vehicles"). At approximately 11:30 p.m., one of the Officers ("Officer-1"), who was in the front passenger seat of Unmarked Vehicle-1, observed a blue vehicle (the "Blue Vehicle") whose windows appeared to Officer-1 to be unlawfully tinted. Officer-1 conveyed, in substance and in part, his observation to the other Officers in Unmarked Vehicle-1 and, using a radio, to the Officers in Unmarked Vehicle-2, and the Officers proceeded to pull over the Blue Vehicle.

  b. Unmarked Vehicle-2 pulled behind the Blue Vehicle, and Unmarked Vehicle-2 turned on its police lights. In response, the Blue Vehicle pulled over and stopped, facing north on or about St. Ann's Avenue, in the Bronx, New York. Unmarked Vehicle-1 parked in front of the Blue Vehicle, in an effort to prevent the Blue Vehicle from driving away. At least

some of the Officers in Unmarked Vehicle-1, including Officer-1 and Officer-2, who was in the backseat on the driver side, exited Unmarked Vehicle-1 and approached the Blue Vehicle from the front, shining their flashlights into the Blue Vehicle and ordering the occupants of the Blue Vehicle, in substance and in part, to lower their windows. As they approached, Officer-1 was able to view the individual in the front passenger seat of the Blue Vehicle, later identified as JOSEPH OTERO, the defendant.

  c. Before the Officers could engage with the occupants of the Blue Vehicle, the Blue Vehicle abruptly reversed at an angle and peeled back out into the flow of traffic, fleeing the traffic stop. As the Blue Vehicle pulled back into the flow of traffic, the passenger side of the Blue Vehicle passed by Officer-2, who was able to view the individual in the front passenger seat of the Blue Vehicle, later identified as OTERO, who had rolled down his window. The Officers reentered the Unmarked Vehicles and attempted to chase the Blue Vehicle.

  d. The Blue Vehicle sped north on or about St. Ann's Avenue, in the Bronx, New York. Unmarked Vehicle-2 was behind the Blue Vehicle, albeit at a distance, and Unmarked Vehicle-1 was behind Unmarked Vehicle-2. The Blue Vehicle turned right on or about East 161st Street and, for a brief period, was not visible to the Officers in the Unmarked Vehicles. Following the Blue Vehicle, Unmarked Vehicle-2 also turned right on or about East 161st Street, and Unmarked Vehicle-1 then did the same.

  e. Once Unmarked Vehicle-1 turned on or about East 161st Street, Officer-1, who, once again, was in the front passenger seat, observed the individual whom Officer-1 had seen in the front passenger seat of the Blue Vehicle (*i.e.*, OTERO) running east, in the direction of traffic, on the south sidewalk. Officer-1 conveyed, in substance and in part, his observation to the other Officers in Unmarked Vehicle-1 and, using a radio, to the Officers in Unmarked Vehicle-2. Using a radio, Officers in Unmarked Vehicle-2 conveyed, in substance and in part, that Unmarked Vehicle-2 would continue to chase the Blue Vehicle and directed Unmarked Vehicle-1 to try to apprehend OTERO.

  f. Officer-2, who, once again, was in the backseat on the driver side of Unmarked Vehicle-1, exited Unmarked Vehicle-1 and began to run east on the north sidewalk. Unmarked Vehicle-1 then sped to the end of the block, and Officer-1 exited Unmarked Vehicle-1 and began to run west on the south sidewalk, in an effort to intercept OTERO head on.

  g. As Officer-2 ran east on the north sidewalk, he shined his flashlight across the street to the south sidewalk, where Officer-1 had indicated, in substance and in part, that Officer-1 had seen OTERO running east. Officer-2 observed on the south sidewalk the individual whom Officer-2 had seen in the front passenger seat of the Blue Vehicle (*i.e.*, OTERO) seemingly trying to hide near parked vehicles, and Officer-2 ordered OTERO, in substance and in part, to lie on the south sidewalk, which OTERO did. Officer-2 approached and handcuffed OTERO. Officer-1 joined them as well.

  h. OTERO stated to the Officers, in substance and in part, that the Blue Vehicle fled the traffic stop and that OTERO fled the Blue Vehicle because the occupants of the Blue Vehicle, including OTERO, had purchased a controlled substance and because OTERO had an outstanding warrant. Officer-2 searched OTERO's person and recovered from OTERO's pockets approximately four pills. Based on my review of a report from the NYPD controlled

3

substances laboratory, I have learned that, when the pills arrived at the laboratory, they consisted of approximately two complete pills and approximately three partial pills, suggesting that two of the pills had broken into pieces. The laboratory tested the two complete pills and one of the partial pills, and those tested samples were positive for the presence of methamphetamine.

    i. Other law enforcement officers arrived at the scene, including the Officers from Unmarked Vehicle-2, which returned to the scene after the Blue Vehicle evaded Unmarked Vehicle-2. Law enforcement officers canvassed the area, and one of the Officers who had been in Unmarked Vehicle-2 ("Officer-3") observed a firearm (the "Firearm") in the vicinity of where OTERO had been running, on the opposite side of a chain-link fence, consistent with OTERO having thrown the Firearm over the fence as he was running. The Officers arrested OTERO for possession of the Firearm.

  5. Based on my review of a video of a custodial interview of JOSEPH OTERO, the defendant, on August 6, 2023, at approximately 12:30 a.m. (*i.e.*, approximately one hour after the incidents described above), by a detective of the NYPD (the "Detective"), I have learned, in substance and in part, and among other things, the following:

    a. OTERO was advised of his *Miranda* rights, waived those rights, and agreed to speak with the Detective.

    b. OTERO admitted, in substance and in part, that the Firearm was his. Specifically, OTERO stated, in substance and in part, "It's my fucking gun, my prints are all over it."

  6. Based on my review of an NYPD evidence voucher and an NYPD lab report, I have learned, in substance and in part, and among other things, the following:

    a. The Firearm is a 9mm Smith & Wesson pistol. When law enforcement recovered the Firearm, there was one live round in the chamber, and there were seven live rounds in a magazine in the Firearm.

    b. The Firearm was tested and was found to be operable.

  7. I have communicated with a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, who is familiar with the manufacture of firearms, and who has confirmed that the Firearm was manufactured outside of the State of New York.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of JOSEPH OTERO, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ Brian Shea, by the Court, with permission
Brian Shea
Detective
NYPD

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 19th day of October, 2023.

_____
JAMES L. COTT
United States Magistrate Judge